UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

MILWAUKEE WORLD TRADING LLC,

        Plaintiff,

                                Case No. 22-cv-322-pp

    v.

MICHAEL KAPSCH,
CHRIS DAWLEY and IIGNA,

        Defendants.

**ORDER GRANTING DEFENDANTS DAWLEY AND IIGNA'S MOTION TO
DISMISS AMENDED COMPLAINT (DKT. NOS. 30, 30-1), REQUIRING
PLAINTIFF TO FILE SECOND AMENDED COMPLAINT, REQUIRING
DEFENDANT KAPSCH TO FILE ANSWER TO PLAINTIFF'S SECOND
AMENDED COMPLAINT AND GRANTING DEFENDANTS DAWLEY AND
IIGNA'S MOTION FOR SANCTIONS UNDER RULE 11 (DKT. NOS. 17, 17-1)**

On January 31, 2023, the court held a hearing and discharged its
December 2, 2022 order to show cause, dkt. no. 48, granted defendants Chris
Dawley and IIGNA's (the IIGNA defendants) motion to supplement the record,
dkt. no. 45, and denied without prejudice defendant Michael Kapsch's motion
to dismiss the original complaint (Dkt. No. 1), dkt. no. 39. The court took under
advisement the IIGNA defendants' motion to dismiss the amended complaint,
dkt. no. 30, and their motion for sanctions, dkt. no. 17. Because the court
finds no basis for the exercise of personal jurisdiction over Dawley and IIGNA,
or for many of the allegations against the IIGNA defendants made in the
original complaint, the court will grant both motions.

1

## I. IIGNA Defendants' Motion to Dismiss the Amended Complaint (Dkt. No. 30)

### A. Amended Complaint (Dkt. No. 25)

The alleged conduct dates back to 2019, when in July and August of that year in Kenosha, Wisconsin, Michael Kapsch allegedly recommended that the plaintiff transfer $600,000 into an account for an investment "described by Kapsch as real and solid and to garner a return for projects that Plaintiff is involved in;" Kapsch allegedly was to receive a commission. Dkt. No. 25 at ¶11. The plaintiff alleges that in addition to the $600,00 invested, it expended more than $250,000 in "professional fees and other costs in preparation for the project that the investment . . . was supposed to provide the funding for." Id. at ¶12. The complaint alleges that despite Kapsch's assurances, the investment was fake, the project did not happen and the plaintiff lost "just under 900,000 dollars." Id. at ¶13. When the plaintiff notified Kapsch in June 2021 that it planned to pursue recovery of that money, Kapsch allegedly presented "an alternative that would garner the return of the 900,000 and produce the funding necessary to fund the projects that the original money was intended to cover." Id. at ¶14.

The plaintiff says that the new funding route with Kapsch was through defendants Patrick Maloney (whom the amended complaint does not describe other than saying that his principal place of business is in Chicago) and Chris Dawley (whom the amended complaint indicates is a director at defendant IIGNA). Id. at ¶16. According to the plaintiff,

2

[]i]n order to get Plaintiffs[1] to not pursue recovery of the 900,000, to make a commission, and be able to get additional funds from the Plaintiffs, Defendants IIGNA, Dawley, Maloney and Kapsch through Kapsch made several factual representations including but not limited to 1) they had over 4 billion in cash free and clear to utilize, (stated in writing June 2021, a copy of which Defendants possess) 2) that they were funding professionals, (In writing available on IIGNA website and was stated verbally and in writing) and 3) that they were ready and able to fund Plaintiff and he shouldn't pursue recovery of the 900,000, and that other monies may be needed to make it happen (verbally and in writing on numerous occasions from June 2021 through October 2021) 4) and that they had a very tight relationship with a high up executive at Barclays who would never do business with anyone who wasn't legitimate. (Multiple June 2021 phone conversations).

Id. at ¶16.

The amended complaint says that the "plaintiffs relied on the representations of Defendants," held off on pursuing the money lost in 2019 and "produced documentation for the utilization of the funding they were about to receive." Id. at ¶17. The plaintiff asserts that the affidavits of Dawley and Maloney—attached to the original motion to dismiss (Dkt. No. 16)—support this allegation. Id.

The plaintiff alleges that IIGNA, Dawley, Maloney and Kapsch "through Kapsch" made statements to enhance their credibility, such as claiming that they were in "direct contact with a former member of the USA Joint Chiefs of Staff and his business partner that were developing a tower in downtown Chicago using the exact same funding mechanism that we were engaging in." Id. at ¶18. The plaintiff generally alleges that there were communications from

---

[1] There is a single plaintiff in this case—Milwaukee World Trading, LLC. For reasons that are not clear, the plaintiff's pleadings sometimes refer to itself as "we" or as "the plaintiffs," plural.

the defendants but specifically identifies Kapsch as the only speaker and never identifies any specific communication allegedly by the IIGNA defendants. For example, the plaintiff alleges that

> [a]s July, August, September and October of 2021 went by, every week a new notice was released with direct statements from IIGNA and Dawley to Maloney and then Kapsch explaining 1) the money is all real 2) the process of having the money ready will be completed next week 3) we have over 4 billion free and clear 4) and all moneys invested are in escrow account at Barclays for all those who put skin in the game and 5) Barclays only deals with legitimate people and we have a very close friend at Barclays.

Id. at ¶19.

> In another paragraph, the plaintiff alleges that

> [f]rom June 2021 through February of 2022, hundreds of these communications transferred between Plaintiffs and Kapsch. Some in person in Kenosha, Wisconsin, (January 14, 2022 as just one of multiple meetings in Wisconsin) hundreds of phone calls and hundreds of written communications. All communications were based on information given to Kapsch from the other Defendants, and Kapsch has stated such in writing. On repeated occasion Kapsch would directly quote Moroney[2] and Dawley specifically stating that he was copying and pasting their direct communications on behalf of all the listed Defendants. (December 14th 2021, December 12th 2021, December 9th 2021, December 3rd 2021, December 1st 2021, November 22nd 2021, June 18th 2021, July 2nd 2021, July 22nd 2021, August through October have their own but waiting to pull down all written communications). Upon information and believe when discovery is conducted the court will be able to see matching communications from all the Defendants making its way to Plaintiffs, showing Kapsch was communicating on their behalf and constituting a conspiracy to commit fraud.

Id. at ¶21.

The plaintiff alleges that "Dawley and Maloneys own admissions in their affidavits with this court in their motion to dismiss" show that Dawley and

---

[2] Presumably Maloney.

4

Maloney knew of the "hundreds of communications" and "took in proposals associated with the Plaintiffs." Id. at ¶22. The plaintiff says it relied on the statements made by the defendants and "exposed his[3] professional reputation to them." Id. at ¶23. According to the plaintiff, defendants (it does not say which ones) indicated that reputable companies such as Mizuho and Barclays supported their projects to induce the plaintiff's reliance. Id. at ¶23. The plaintiff began "questioning the legitimacy of what was happening and informed Kapsch that if it was all fraudulent that litigation would be an obvious route." Id. The plaintiff alleges that sometime between December 2021 and January 2022, "IIGNA and Dawley through Maloney and Kapsch announced that they had brought on Mizuho Bank to address the issues that were taking place causing the delays." Id. at ¶24. The plaintiff says that the "defendants refused at any time to give any details of why 7 months had passed and money that they declared was free and clear and intended to remedy the situation of 2019 was not available." Id. at ¶25.

In February 2022, the plaintiff "notified [it does not say who it notified] that unless they received some timetable, explanation and certification when they were receiving their missing funds, missing funding and/or damage remedied they would have to pursue legal action." Id. at ¶26. The plaintiff says Kapsch responded that "it was unlikely that anything would be done for

---

[3] The plaintiff is a single-member LLC whose sole member is Emmanuel Mamalakis. Dkt. No. 49. Mamalakis also is the plaintiff's counsel. This fact may explain why the plaintiff—a limited liability corporation—sometimes references itself in the masculine "his" or "him."

5

Plaintiffs now since the Defendants were so offended by Plaintiff's accusations of fraudulent statements." Id. at ¶27. The plaintiff claimed that "[a]lmost all the fraudulent statements were made in writing" and that the plaintiff provided Kapsch with "images of all the statements." Id. The plaintiff filed the original complaint on March 14, 2022, but the amended complaint says that as of May 2022, Barclays and Mizuho still were "engaging with the other Defendants on the scheme they are accused of showing their willing participation being fully aware that the other conspirators are engaged in known and identifiable fraudulent acts." Id. at ¶28.

Without providing any time frame, the plaintiff says that "plaintiffs now make repeated calls, emails, texts and voicemails. Defendants refuse to reply and on last communication will not be bothered with Plaintiffs concerns." Id. at ¶29. The plaintiff alleges that the 2019 investment was fake and fraudulent and that the "statements made by defendants Dawley, Maloney, Kapsch and IIGNA that they possessed 4 billion free and clear on a dozen different occasions was false." Id. at ¶30. The plaintiff maintains that Kapsch "affirmatively represented that all statements were from Maloney, Dawley and IIGNA." Id. at ¶30.

Count One of the amended complaint alleges fraud in the inducement— naming only Kapsch—in relation to the 2019 investment. Id. at ¶33-36. Count Two alleges fraud—specifically, that the IIGNA defendants, Maloney and Kapsch made representations that they possessed $4 billion free and clear, that the movement of funds was imminent and that the transfer was taking

6

place (when it was not). Id. at ¶38. Count Three alleges conspiracy to commit fraud against all defendants. Id. at ¶40. The plaintiff seeks $40,900,000 against Kapsch and asks the court to find all the defendants liable for fraud and conspiracy and to enter a money judgment for lost profits. Id. at p. 10.

B. Parties' Briefs

1. *IIGNA Defendants' Brief in Support of Motion to Dismiss (Dkt. No. 30-1)*

The IIGNA defendants have moved to dismiss the amended complaint for failure to state an intentional misrepresentation or conspiracy claim under Rule 12(b)(6) and lack of personal jurisdiction under Rule 12(b)(2). Dkt. No. 30-1. The IIGNA defendants argue that there are no facts that satisfy the requirements of Wisconsin's long-arm statute or the minimum contacts required to bring these defendants into a Wisconsin court. Id. at 24. They recount that the alleged basis for jurisdiction is that the IIGNA defendants "collectively conducted business and/or engaged in the conduct complained of [] in this judicial district." Id. at 24 (citing Dkt. No. 25 at ¶9). They assert, however, that the plaintiff has not alleged that the IIGNA defendants engaged in any act or omission in Wisconsin, id. at 25, and argue that they have proffered evidence that Kapsch never acted as their agent, id. at 26. The IIGNA defendants allege that the only possible connection to Wisconsin is that the IIGNA defendants (officed in Georgia) allegedly made representations to Maloney (a resident of Illinois), who allegedly made statements to Kapsch, who allegedly made representations to the plaintiff in Wisconsin. Id. at 28. They assert that even if those allegations were true, there are no facts demonstrating

7

that any of the "intermediaries" were authorized to speak on behalf of the IIGNA defendants. Id.

The IIGNA defendants assert that they have no contacts of any kind with Wisconsin, making it impossible for the plaintiff to establish specific or general jurisdiction. Id. at 31-33. They emphasize that Dawley is domiciled in New Jersey and IIGNA is incorporated in Delaware with a principal place of business in Georgia. Id. at 33 (citing Dkt. No. 30-4 at ¶¶3-5). Dawley avers that neither he nor IIGNA ever have conducted nor do they presently conduct business in Wisconsin or with any person or business in Wisconsin. Dkt. No. 30-4 at ¶7.

In support of the motion to dismiss for lack of personal jurisdiction, the IIGNA defendants filed a declaration from one of their New York counsel, Robert Scheef (Dkt. No. 30-2), who attached to his declaration the declaration of former defendant Patrick Maloney (Dkt. No. 30-2 at 3-5). In his declaration, Maloney explained that he does not know Emmanuel Mamalakis (the sole member of the single-member LLC plaintiff and its counsel in this litigation) and never communicated with him orally or in writing. Dkt. No. 30-2 at 3, ¶3. Maloney avers that he never was involved with the 2019 investment, id. at ¶5, and that Kapsch and Maloney have not been partners since 2019. Id. at ¶7. He avers that he never authorized Kapsch to speak on his behalf or on behalf of the IIGNA defendants. Id. at ¶7. He avers that he has no relationship with Barclays Bank or Mizuho Bank. Id. at ¶8. Maloney avers that he has been doing consulting work with IIGNA since 2019, but that he is not IIGNA's agent

8

or representative, nor Christopher Dawley's. Id. at ¶9. He avers that he discussed with Kapsch Maloney's business relationship with IIGNA—which included a construction project in Chicago—and that Maloney told Kapsch "the funding structure IIGNA uses." Id. at ¶10. He avers that it was through this discussion (unrelated to the plaintiff) that Kapsch learned that Barclays and Mizuho were involved with IIGNA's funding structure. Id. Maloney admits that in September 2019, Kapsch sent him—unsolicited—"white papers for two projects for which [the plaintiff] was seeking funding," and that Kapsch asked Maloney to find out whether IIGNA would be interested in the projects. Id. at ¶11. He avers, however, that though he forwarded the white papers to Chris Dawley, the two never had the opportunity to discuss them, and whenever Kapsch asked about the status of the white papers, Maloney "was very clear that Mr. Dawley and I had not had the opportunity to even begin to review the projects." Id. at ¶12. Maloney avers that neither he nor, to his knowledge, Dawley ever indicated that IIGNA would fund any project by the plaintiff, nor committed that IIGNA would provide such funding. Id.

Christopher Dawley, the chief executive officer of IIGNA, also filed a declaration in support of the motion to dismiss for lack of personal jurisdiction in which he avers that he has resided in New Jersey for over twenty years and never has lived or worked in Wisconsin. Dkt. No. 30-4 at ¶¶3, 4. He avers that IIGNA is not registered in Wisconsin and never has maintained an office in Wisconsin. Id. at ¶6. He avers that neither he nor IIGNA has conducted or currently conducts business in Wisconsin. Id. at ¶7. Dawley avers that neither

9

Dawley nor IIGNA solicits or advertises for business in Wisconsin, either directly or indirectly, and that neither he nor IIGNA have agents, employees or representatives in Wisconsin. Id. at ¶¶8-9. Dawley avers that he does not know Emmanuel Mamalakis and never has communicated with him orally or in writing. Id. at ¶10. Dawley avers that he doesn't know if there is anyone other than Mamalakis involved with the plaintiff, but he avers that if there is, he never has communicated with such a person or persons. Id. at ¶11. According to Dawley, neither he nor IIGNA ever authorized Maloney to speak on his or IIGNA's behalf, and he avers that while IIGNA has done business with Maloney from time to time since 2018, Maloney is not an agent, employee or representative of IIGNA or Dawley. Id. at ¶12. Dawley also avers that neither he nor IIGNA authorized Kapsch to speak for the IIGNA defendants and that Kapsch never has been an agent, employee or representative of IIGNA or of Dawley. Id. at ¶13. Dawley avers that until he received a copy of the complaint, he was not aware that Maloney had communicated with Kapsch about IIGNA or that Kapsch had communicated with Mamalakis. Id. at ¶15.

2. *Plaintiff's Brief in Opposition (Dkt. No. 32)*

The plaintiff insists that the amended complaint pleads all necessary facts to show that Kapsch and Maloney acted as agents of the IIGNA defendants. Dkt. No. 32 at 5. The plaintiff focuses on paragraph 16 of the amended complaint, which alleges that the IIGNA defendants made representations through Kapsch that they had over four billion in cash free and clear to utilize, that they were funding professionals, that they were ready and

10

willing to fund the plaintiff and he shouldn't pursue recovery of the $900,000 and that they had a tight relationship with Barclay's and wouldn't do business with anyone who wasn't legitimate. Id. at 6, 8-9 (citing Dkt. No. 25 at ¶16). According to the plaintiff, the IIGNA defendants replied to questions through Kapsch and Maloney and accepted the plaintiff's proposals through Maloney. Id. at 7 (citing Dkt. No. 25 at ¶¶21, 22). The plaintiff cites paragraphs 18 and 19 of the amended complaint for its argument that the IIGNA defendants acted "through Kapsch," although the plaintiff does not allege any dates and times of the communications (other than to say that they happened between July and October of 2021). Id. at 9 (citing Dkt. No. 25 at ¶¶18,19). The plaintiff claims that "on repeated occasion [sic] Kapsch would directly quote Moroney[4] and Dawley specifically stating that he was copying and pasting their direct communications on behalf of all the listed Defendants." Id. at 10 (citing Dkt. No. 25 at ¶21).

The plaintiff maintains that the amended complaint sufficiently alleges that Kapsch was acting as an agent while making fraudulent statements in Wisconsin and over texts and phone calls for the purpose of "taking money from people wanting funding pretending to be professional funders." Id. at 10. The plaintiff cites the same paragraphs (16-23) of the amended complaint to argue that it has shown a principal/agent relationship between Kapsch and the IIGNA defendants and that the alleged conduct fell with the scope of the agency. Id. at 14. The plaintiff asserts that Maloney admitted in his affidavit

---

[4] Again, presumably Maloney.

that he "provided the IIGNA defendants with [Milwaukee World Trading LLC] proposals he received from Kapsch." Id. at 14-15 (citing Dkt. No. 17-3 at 7, ¶12). The plaintiff claims that, at a minimum, that admission establishes "Apparent Authority and acting to Ratify all the prior conversations, the agency theory of Ratification." Id. at 15. The plaintiff also cites to page 14 of the IIGNA defendants' motion to dismiss (Dkt. No. 30), which contains a text from Kapsch to the plaintiff indicating that Kapsch could not "make any commitments until money is in hands;" the plaintiff insists that the statement "I cannot make any commitments" shows that Kapsch was an agent with full legal authority and was only waiting for the money to arrive. Id.

       3.    *IIGNA Defendants' Reply Brief (Dkt. No. 37)*

The IIGNA defendants reply that Kapsch, and only Kapsch, made the alleged representations, that there is no basis to attribute the statements to the IIGNA defendants and that any damages claimed by the plaintiff are attributable to the 2019 transaction. Dkt. No. 37 at 5. The IIGNA defendants argue that the plaintiff has failed to satisfy the Rule 9(b) standard because the plaintiff never says when or how each misstatement was made, or whether particular statements were made in writing, over the phone or in person. Id. at 6.

With respect to actual authority, the IIGNA defendants respond that the fact that one person can send something to another doesn't show that the recipient controls the sender. Id. at 7. They assert that Maloney's declaration shows the "precise opposite," because though Maloney admits to having

received unsolicited white papers from Kapsch and forwarding them to Dawley, Maloney avers that he and Dawley never had the opportunity to discuss the papers. Id. at 7-8. The IIGNA defendants assert that the plaintiff has not shown apparent authority because apparent authority must be traceable to the principal—the principal is liable only for the appearance of authority caused by himself. Id. at 10 (quoting Amplicon, Inc. v. Marshfield Clinic, 786 F. Supp. 1469, 1476 (W.D. Wis. 1992)). The defendants argue that nothing in the amended complaint suggests that the IIGNA defendants ratified Kapsch's actions, id. at 11, or that the plaintiff had any reasonable basis for relying on Kapsch's statements when Kapsch never committed funding to the project, id. at 12. The defendants assert that the alleged statements that they had "4 billion in cash free and clear to utilize" or a "tight relationship with a high-up executive at Barclays" are statements that describe the IIGNA defendants, but that coming from Kapsch, they were "pure puffery" that the plaintiff could not reasonably have relied upon. Id. at 13 (citing Indemnified Cap. Inv., S.A. v. R.J. O'Brien & Assocs., Inc., 12 F.3d 1406, 1412-13 (7th Cir. 1993) and Loula v. Snap-On Tools Corp., 498 N.W.2d 866, 869 (Wis. Ct. App. 1993)).

Finally, the IIGNA defendants reply that the plaintiff has failed to rebut their evidence that Kapsch was not their agent or that they were not aware that Maloney had spoken with Kapsch or that Kapsch was the person who was speaking with the plaintiff. Id. at 16. They argue that without any agency relationship, there is nothing in the record to establish personal jurisdiction. Id. at 17.

4.     *January 31, 2023 Hearing*

On December 2, 2022, the court issued an order to show cause. Dkt. No. 48. The order recounted that while the plaintiff had alleged that the court had diversity subject-matter jurisdiction, the plaintiff had not complied with Civil Local Rule 8 of the Eastern District, which requires a limited liability company to identify the citizenship of all its members. Id. at 1-2. The court observed that it could not even determine how many plaintiffs had filed suit because plaintiff's counsel's address was the same as the plaintiff's address, and counsel often referred "plaintiff" and to "plaintiffs"—plural—in the complaint. Id. at 2. The order noted that once the plaintiff had supplemented the record and complied with the local rule identifying its members, the court would address the IIGNA defendants' motion to dismiss the amended complaint based on lack of personal jurisdiction and other pending motions, including the IIGNA defendants' motion for Rule 11 sanctions. Id. at 3. The court also observed that the plaintiff had not timely responded to the sanctions motion. Id. The court ordered the plaintiff to file a written supplement showing cause to conclude that the court had subject-matter jurisdiction and identifying its members by December 16, 2022. Id. at 3-4.

On December 5, 2022, the court received a letter from Attorney Emmanuel Mamalakis, the plaintiff's counsel, indicating that he was the sole member of the plaintiff. Dkt. No. 49. Three days later, the court received an almost identical letter from Mamalakis. Dkt. No. 50. The same day, the court

14

received from Mamalakis an amended civil cover sheet, modifying the damages demanded from $409,000,000 to $40,900,000. Dkt. Nos. 51, 51-1.

Four days later, the court scheduled a hearing for January 31, 2023. Dkt. No. 52. Although the court did not title the hearing an "evidentiary" hearing, the docket entry stated that the motions the court planned to address at the hearing were the IIGNA defendants' motion for sanctions, the motions to dismiss filed by defendant Kapsch and by the IIGNA defendants, and the IIGNA defendants' motion to supplement the record to add a declaration by defendant Kapsch. At no point in the eight-month period between May 18, 2022—the date the IIGNA defendants filed their motion to dismiss for lack of personal jurisdiction (and failure to state a claim) and January 31, 2023—the date scheduled for the hearing—did the plaintiff ask for time to conduct jurisdictional discovery.

The court recorded the January 31, 2023 hearing; the audio is on the docket at Dkt. Nos. 54, 55. During the hearing, the court asked the plaintiff's counsel, Attorney Mamalakis, if he had any evidence that he had not presented that would support the conclusion that defendant Kapsch was an agent of IIGNA or Chris Dawley. Mamalakis responded that he was relying on texts from Kapsch and that he'd included examples of those texts in his brief in opposition to the defendants' motions. The court asked Mamalakis for examples of texts Kapsch had sent that would support the plaintiff's theory that Kapsch was acting as an agent of the IIGNA defendants when interacting with the plaintiff; Mamalakis identified a text in which Kapsch had indicated that "they said the

15

money would be available next week." He argued that Kapsch could not have provided the descriptions he had of what the IIGNA defendants were doing if he'd not been their agent. The court advised the plaintiff that under Seventh Circuit law, Kapsch's statements were not sufficient, and that Mamalakis's conclusions drawn from anything Kapsch might have said were not evidence. When the court again asked Mamalakis what evidence he had to support his agency theory, Mamalakis responded that he was relying on the defendants' own affidavits, in which, he said, they admitted having "taken in" his proposals; he argued that the defendants would not have taken his proposals from Kapsch if there was not an agency relationship. The court observed that passing documents on to someone else does not make that person the agent of the person to whom the documents were passed.

When addressing the IIGNA defendants' motion to supplement the record with Kapsch's affidavit, the court advised Mamalakis that once the defendants had submitted evidence, the court could consider that evidence and observed that the plaintiff had neither refuted the defendants' evidence (their sworn declarations) nor presented any evidence of its own.

At the end of the hearing, the court denied without prejudice Kapsch's motion to dismiss, granted the IIGNA defendants' motion to supplement, discharged the December 2, 2022 order to show cause and took under advisement the IIGNA defendants' motion to dismiss and their motion for sanctions. Dkt. No. 56.

16

5. *Supplemental Declaration*

For purpose of resolving personal jurisdiction, the court granted the plaintiff's motion to supplement the record with the declaration of Kapsch (Dkt. No. 45). Dkt. No. 56. In that declaration, Kapsch avers that Mamalakis approached him in June of 2021 regarding funding for two projects. Dkt. No. 45-3 at ¶4. Kapsch says that he told Mamalakis that Kapsch would ask Maloney if Maloney (a former friend and colleague of Kapsch's) knew anyone who might be interested. Id. at ¶5. Kapsch avers that he never has communicated with anyone other than Maloney or Mamalakis regarding Mamalakis's projects. Id. at ¶6. He avers that he never spoke with Dawley or any other representative of IIGNA, id. at ¶7, and that no one from IIGNA authorized him to speak on their behalf (or on behalf of Maloney, Barclays Bank or Mizuho Bank). Id. at ¶8. Kapsch states that he is not—and never has been—authorized to speak on behalf of Maloney, Dawley, IIGNA, Barclays Bank or Mizuho Bank. Id. at ¶9. He adds that he has "never represented or otherwise held [himself] out to be an agent, representative or employee of Mr. Maloney, Mr. Dawley, IIGNA, Barclays Bank, or Mizuho Bank." Id. at ¶10.

C. Legal Standard

The IIGNA defendants move to dismiss the amended complaint under Rules 12(b)(2) and 12(b)(6). A Rule 12(b)(2) motion tests the court's personal jurisdiction over a defendant. Fed. R. Civ. P. 12(b)(2). The court takes the facts asserted in the complaint as true, and the complaint need not allege facts demonstrating the existence of personal jurisdiction, but once the defendant

17

moves to dismiss the complaint for lack of personal jurisdiction under Rule 12(b)(2), "the plaintiff bears the burden of demonstrating the existence of jurisdiction." Curry v. Revolution Laboratories, LLC, 949 F.3d 385, 392 (7th Cir. 2020) (quoting Purdue Research Found. v. Sanofi-Synthelabo, S.A., 338 F.3d 773, 782 (7th Cir. 2003)). If the court decides a Rule 12(b)(2) motion without an evidentiary hearing, the plaintiff bears the burden of making only a *prima facie* case for personal jurisdiction. Id. (quoting uBID, Inc. v. GoDaddy Grp., Inc., 623 F.3d 421, 423 (7th Cir. 2010)). But if the defendants submit "evidence opposing the district court's exercise of personal jurisdiction, the plaintiff[] must similarly submit affirmative evidence supporting the court's exercise of jurisdiction." Matlin v. Spin Master Corp., 921 F. 3d 701, 705 (7th Cir. 2019).

A Rule 12(b)(6) motion attacks only the allegations within the four corners of the complaint. When considering a motion to dismiss for failure to state a claim, courts "take all the factual allegations in the complaint as true," Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009), and draw all reasonable inferences in the plaintiff's favor, Roberts v. City of Chi., 817 F.3d 561, 564 (7th Cir. 2016). In contrast to considering a motion to dismiss under 12(b)(2), a court considering a motion to dismiss under Rule 12(b)(6) generally cannot consider matters outside the pleadings. See Fed. R. Civ. P. 12(d).

If this court does not have personal jurisdiction over the IIGNA defendants, it need not determine whether the complaint states a claim against

those defendants. The court will start by analyzing the question of whether it has personal jurisdiction over the IIGNA defendants.

D.    <u>Analysis</u>

1.    *Personal Jurisdiction*

Because there is no federal statute authorizing nationwide service of process, a federal court looks to the law of the forum state in which it sits to determine the limits of its personal jurisdiction. <u>Adv. Tactical Ordnance Sys., LLC v. Real Action Paintball, Inc</u>., 751 F.3d 796, 800 (7th Cir. 2014); <u>see also</u> <u>Felland v. Clifton</u>, 682 F.3d 665, 672 (7th Cir. 2012). Wisconsin courts employ a two-step inquiry when determining whether a court has personal jurisdiction over a nonresident defendant. First, the court determines whether the criteria for personal jurisdiction under Wisconsin's long-arm statute have been satisfied. <u>U.S. Venture Inc. v. McCormick Transp. LLC</u>, No. 15-cv-990, 2015 WL 6694031, *2-3 (E.D. Wis. 2015) (citations omitted). If the requirements of the long-arm statute are satisfied, the court must consider whether the exercise of jurisdiction over the defendant is consistent with due process. <u>Id.</u> at *2-3.

Due process prohibits a state from binding a nonresident defendant to a judgment of its courts unless the nonresident has "certain minimum contacts . . . such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" <u>Int'l Shoe Co. v. Washington</u>, 326 U.S. 310, 316 (1945) (citation omitted). Those traditional notions of fairness mean that a defendant may not be forced to appear in a district court unless it has done

19

something to make it "reasonably anticipate being haled into court there." Burger King Corp. v. Rudzewics, 471 U.S. 462, 474 (1985) (citation omitted). There are two ways that a nonresident defendant might reasonably anticipate being haled into an out-of-state court: specific or general jurisdiction. Ford Motor Co. v. Mont. Eighth Judicial Dist. Court, ___ U.S. ___, 141 S. Ct. 1017, 1024 (2021). General jurisdiction exists where the defendant is "at home." Daimler AG v. Bauman, 571 U.S. 117, 137 (2014). Specific jurisdiction exists where the defendant has sufficient contacts with the forum state. Walden v. Fiore, 571 U.S. 277, 285 (2014).

> a.      Wisconsin's Long-Arm Statute

The court begins with Wisconsin's long-arm statute, Wis. Stat. §801.05. The court has jurisdiction where there is a local act or omission, Wis. Stat. §801.05(3), a local injury but foreign act, Wis. Stat. §801.05(4), or local services, goods or contracts, Wis. Stat. §801.05(5). When it amended the complaint, the plaintiff added paragraph 9 regarding personal jurisdiction:

> This Court has personal jurisdiction over Defendants because they collectively conducted business in this judicial district and/or the conduct complained of took place in this judicial district. All Defendants through Kapsch physically entered the state of Wisconsin for meetings in Kenosha on numerous occasions, conducted hundreds of phone calls and communications in writing over a ten month period of time from June 2021 through February 2022. Kapsch specifically on behalf of all Defendants, directly carried specific messages from all defendants both verbally and in writing on hundreds of occasions, making the fraudulent statements, directly attributed to being from Defendants Maloney, Dawley, IIGNA and backed by the credibility of Mizuho and Barclay's, verbally and in writing. Kapsch solicited and accepted proposals that were then received and commented on by all the partners listed as Defendants in this suit. Defendants espoused

20

themselves to the Jurisdiction of the State of Wisconsin through hundreds of ongoing communications and interactions.

Dkt. No. 25 at ¶9.

Other than this unsupported statement, the plaintiff never has alleged that the IIGNA defendants came into Wisconsin, conducted phone calls with the plaintiff in Wisconsin or communicated in writing with the plaintiff in Wisconsin. The closest the plaintiff comes to alleging any action by the IIGNA defendants is in paragraph 9 of the amended complaint, where it alleges that all the partners listed as defendants "received and commented on the proposals." Dkt. No. 25 at ¶9. The plaintiff relies on its allegations that *Kapsch* acted for the defendants in this state. This theory works only if the facts support an agency theory—that Maloney, Kapsch or both were agents or representatives of IIGNA or Dawley. According to the plaintiff, the IIGNA defendants are subject to personal jurisdiction under the actual authority of Kapsch, apparent authority or ratification principles. Dkt. No. 32 at 5.

### i.    **Actual authority**

Actual authority "requires that at the time of an agent's conduct, 'the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act." Restatement (Third) of Agency §2.01. To establish actual authority, the plaintiff must show that there was (1) a principal/agent relationship, (2) the principal controlled or had the right to control the agent's conduct, and (3) the conduct fell within the scope of the agency. Spitz v. Proven Winners N. Am., LLC, 759 F.3d 724, 731 (7th Cir. 2014).

The problem with the plaintiff's actual authority theory is that Kapsch made all the alleged statements. There are no allegations—and the plaintiff has presented no evidence[5]—that the IIGNA defendants did anything to make Kapsch believe they wanted him to act on their behalf, and Kapsch avers that they did not do so. Dawley, as the chief executive officer of IIGNA, filed a declaration stating that IIGNA has no agents, employees or representatives in Wisconsin. Dkt. No. 30-4 at ¶¶3-9. Dawley never has lived or worked in Wisconsin, id. at ¶4, IIGNA is not registered to conduct business in Wisconsin and has no office here, id. at ¶¶6, 7, and IIGNA—a Delaware corporation—has its principal place of business in Atlanta, Georgia. Id. at ¶5. Dawley avers that neither he nor IIGNA have conducted or currently conduct business in Wisconsin. Id. at 7. He avers that neither Kapsch nor Maloney are agents, employees or representatives of IIGNA or Dawley, and neither Kapsch nor Maloney are (or were) authorized to speak on behalf of the IIGNA defendants. Id. at ¶¶12, 13. Dawley avers that he does not know Mamalakis and never has communicated with Mamalakis (including by "text, email or other electronic means)" or communicated with anyone else affiliated with the plaintiff (if there was anyone else). Id. at ¶¶10-12.

---

[5] As the court has noted, despite responding to the motion to dismiss and appearing at the January 31, 2023 hearing, the plaintiff did not present any evidence at that hearing. Nor did he file any affidavits or other evidence in opposition to the motion to dismiss prior to the hearing. Nor has he asked the court in the almost forty-five days since the January 31, 2023 hearing to allow him to conduct jurisdictional discovery or provide evidence.

The plaintiff produced no evidence of it own, either in its opposition to the motion to dismiss or at the January 31, 2023 hearing. Instead, the plaintiff relies on the Dawley and Maloney declarations and references them in the amended complaint:

> 17. Based on these representations Plaintiffs relied on the representations of Defendants and suspended pursuit of the monies lost above and produced documentation for the utilization of the funding they were about to receive. (Defendants Dawley and Maloney affirm this in their affidavits attached to their motions to dismiss).
>
> . . . .
>
> 22. By Defendants Dawley and Maloneys own admissions in their affidavits filed with this court in their motion to dismiss, Dawley and Maloney not only knew about all of the hundreds of communications, they took in proposals associated with the Plaintiffs. And according to Kapsch on repeated occasions were directly replying to Plaintiffs concerns about the validity of their representations.

Dkt. No. 25 at 4, 6.

The court assumes that the plaintiff is referring to the Dawley and Maloney declarations attached to the IIGNA defendants' March 26, 2022 letter to Mamalakis regarding Rule 11, dkt. no. 17-3, and the declarations filed in support of the motion to dismiss the original complaint, dkt. nos. 17-4 and 17-5. These declarations do not support the plaintiff's allegations. Nothing in the four declarations gives the impression that Dawley or Maloney knew about the alleged "hundreds of communications," or that they knew the plaintiff had allegedly relied on them or that they knew anything about the money the plaintiff claimed to have lost in 2019 and the plaintiff's alleged abandonment of pursuit of that money.

While Maloney's declaration avers that he sent two white papers to Dawley, none of the declarations even hints that Maloney or Dawley "directly replied" to the plaintiff regarding those white papers. Both Dawley and Maloney aver that they do not know Mamalakis and never have communicated with him. Dkt. No. 17-3 at 7, ¶¶3,4; Dkt. No. 17-3 at 9, ¶3. Dawley avers that Maloney is not an agent, employee or representative of IIGNA or Dawley. Dkt. No. 17-3 at 7 ¶9. Neither Kapsch nor Maloney were authorized to speak on IIGNA or Dawley's behalf. Dkt. No. 17-3 at 9, ¶7; Dkt. No. 17-5 at ¶13. Kapsch sent Maloney "unsolicited, white papers for two projects for which [the plaintiff] was seeking funding" and Kapsch asked Maloney to determine whether IIGNA would be interested. Dkt. No. 17-3 at 7, ¶11. Maloney averred that he forwarded the white papers to Dawley, but that he made it clear to Kapsch that they hadn't even begun the review process. Dkt. No. 17-3 at 7, ¶12. Dawley avers that he has not reviewed "the white papers" and spoke with Maloney only in the broadest of terms. Dkt. No. 17-3 at 10, ¶11. Dawley avers that neither he nor IIGNA communicated to Maloney "any interest, let alone commitment, to fund the [plaintiff's] projects described in the aforesaid white papers." Dkt. No. 17-3 at 10, ¶11. Dawley avers he "was not aware that Kapsch communicated with Mamalakis or the plaintiff regarding IIGNA or any other subject until IIGNA received a copy of the complaint." Dkt. No. 17-5 at ¶15.

The plaintiff also cites paragraph 21 of the amended complaint, which alleges that "on repeated occasion Kapsch would directly quote Moroney[6] and

_____

[6] Again, presumably Maloney.

Dawley specifically stating that he was copying and pasting their direct communications on behalf of all the listed Defendants. (December 14th 2021, December 12th 2021, December 9th 2021, December 3rd 2021, December 1st 2021, November 22nd 20221, June 18th 2021, July 2nd 2021, July 22nd 2021)." Dkt. No. 32 at 14 (citing Dkt. No. 25 at ¶21). Again, this paragraph describes statements and claims made by *Kapsch*—not Dawley or IIGNA. The plaintiff has chosen to rely solely on its allegations, even though the IIGNA defendants have produced evidence—sworn declarations—that they did not authorize Kapsch, did not employ Kapsch and that Dawley was not even aware until he received a copy of the complaint that Kapsch had communicated with Mamalakis or the plaintiff regarding IIGNA.

ii. **Apparent authority**

To the extent that the plaintiff is suggesting that Kapsch had apparent authority to act for the IIGNA defendants, as the court explained at the January 31, 2023 hearing, apparent authority requires something more than a statement by the alleged agent. "Apparent authority exists when a third-party reasonably relies on the principal's manifestation of authority to an agent." Am. Soc'y of Mech. Engineers v. Hydrolevel Corp., 456 U.S. 556, 565–74, (1982). See also Restatement (Second) of Agency §8 (1957); Warciak v. Subway Restaurants, Inc., 949 F.3d 354, 357 (7th Cir. 2020) ("Apparent authority exists when a third-party reasonably relies on the principal's manifestation of authority to an agent."). "Statements by an agent are insufficient to create apparent authority." Warciak, 949 F.3d at 357. The principal must "speak,

25

write, or otherwise act toward a third party" such that the third party would reasonably believe the principal consented to the agent's actions. See Bridgeview Health Care Ctr., Ltd. v. Clark, 816 F.3d 935, 939 (7th Cir. 2016). The plaintiff has not alleged any written or spoken words—or any action—by Dawley or IIGNA that could cause the plaintiff to believe that the IIGNA defendants had consented to Kapsch acting on their behalf. Even if the amended complaint had alleged that *Kapsch* stated that he was acting as the agent of the IIGNA defendants, "statements by an agent are insufficient to create apparent authority without also tracing the statements to a principal's manifestations or control." Warciak, 949 F.3d at 357 (citing Restatement (Third) of Agency § 2.03 cmt. C (2006)).

### iii. **Vicarious authority**

Finally, the plaintiff has not demonstrated that Kapsch had vicarious authority through ratification. Ratification occurs when a party affirms "a prior act done by another, whereby the act is given effect as if done by an agent acting with actual authority." Restatement (Third) of Agency §4.01(1). An act is ratified when the party manifests assent or otherwise engages in conduct that would reasonably imply consent, such as by knowingly accepting the benefit of an agent's action. See Restatement (Third) of Agency §4.01(2) & cmt. g.

The plaintiff cites to a declaration filed by one of the defendants' attorneys, Mark Maciolek, to whom the plaintiff's attorney, Mamalakis, had provided a series of screenshots of what appeared to Maciolek to be text messages sent to someone called "Mike" with the initials "MK." Dkt. No. 30-3 at

26

¶2. Maciolek averred that Mamalakis sent him the texts after advising Maciolek that Mamalakis would informally provide Maciolek "with some of the documents underlying [the plaintiff's] claims." Id. Maciolek attached to the declaration a screenshot of one such document—a text message. Id. at page 4. The purported text is dated Friday, June 18 (no year) at 1:34 p.m.; it appears to be part of a series of messages from "Mike," with the initials "MK." There is no indication of the identity of the recipient of the text. After receiving a message that read, "Good sir," "MK"—presumably Michael Kapsch—wrote:

> I cannot make any commitments until money is in hands. Commentary today is that the 4 B is free and clear and ready to be transferred. Supposedly will have access on Monday. Sadly I've heard that other times. Of course I want to fund this. I hope you can hold them off a tad longer.

Dkt. No. 30-3 at 4.

The IIGNA defendants argue that this text demonstrates that Kapsch made no funding commitment to the plaintiff's projects and that Kapsch was not acting as IIGNA's agent. The defendants are correct; the text says that Kapsch cannot commit until he has money, and that he has heard "commentary" from unidentified persons or entities that there is money available to be transferred but that he is skeptical he will get it soon. Kapsch (if the text is from Kapsch) indicates that *he* wants to fund "this"—not "we" or "they." The text does not manifest assent by the IIGNA defendants for Kapsch to act as their agent, or otherwise imply their consent for him to do so; it does not indicate that the IIGNA defendants knowingly accepted the benefits of Kapsch's actions (whatever those might have been). The text is not ratification

of Kapsch acting as the IIGNA defendants' agent such that he can be considered an agent under the ratification theory.

The plaintiff arguably has not even made a *prima facie* case that the amended complaint alleges personal jurisdiction over the IIGNA defendants, much less presented evidence to refute the evidence presented by the defendants. Seventh Circuit law does not support the plaintiff's theory that Kapsch acted as an agent for the IIGNA defendants. There is nothing in the record to support the plaintiff's theory that the IIGNA defendants committed a local act or omission, Wis. Stat. §801.05(3), that Kapsch solicited the plaintiff on the defendant's behalf, Wis. Stat. §801.05(4), or that the IIGNA defendants promised the plaintiff to perform services or pay for services in Wisconsin or that they otherwise performed those services, Wis. Stat. §801.05(5).

b. Due Process

The plaintiff also has failed to satisfy the due process prong of the personal jurisdiction inquiry. General jurisdiction is not at issue because the IIGNA defendants do not reside in this state or do business in this state; they have no agents, officers or employees in Wisconsin. Citing <u>Bilek v. Fed. Ins. Co.</u>, 8 F.4th 581, 590 (7th Cir. 2021), the plaintiff suggests that the court has specific jurisdiction over the IIGNA defendants through their agent's suit-related contacts. Dkt. No. 32 at 20-21. An agent's conduct can establish specific personal jurisdiction, <u>see</u> <u>Bilek</u>, 8 F.4th at 590, but the facts of <u>Bilek</u> are inapposite. The plaintiff in <u>Bilek</u> alleged that the principal allowed the agents to provide insurance quotes, email the quotes and enter information

28

into the principal's system. Id. at 591. The agents in Bilek had actual authority. As the court has found, the allegations in the amended complaint in this case involve Kapsch and representations by Kapsch that he was in contact with the IIGNA defendants; those allegations do not support an argument that Kapsch had actual authority. By failing to allege facts demonstrating that Kapsch had authority and by failing to present any evidence rebutting the evidence submitted by the IIGNA defendants, the plaintiff has failed to show that the IIGNA defendants "purposefully established minimum contacts with the forum." Cent. States, Se. and Sw. Areas Pension Fund v. Reimer Express World Corp., 230 F.3d 934, 942-43 (7th Cir. 2000) (citing Burger King Corp. v. Rudzewicz, 471 U.S. 462, 474-76, 105 S. Ct. 2174 (1985)).

There is no basis for this court to exercise personal jurisdiction over the IIGNA defendants. The court must dismiss those defendants, and thus it cannot consider the defendants' argument under Rule 12(b)(6) that the amended complaint fails to state a claim against them.

## II.    IIGNA Defendants' Motion for Sanctions (Dkt. No. 17)

A.    IIGNA Defendants' Brief (Dkt. No. 17-1)

On April 27, 2022, the IIGNA defendants filed a motion for Rule 11 sanctions against the plaintiff's attorney and sole member, Mamalakis. Dkt. No. 17-1. The IIGNA defendants ask the court to sanction Mamalakis for filing a complaint against them (the original complaint) alleging fraud and conspiracy even though they never met Mamalakis or communicated with the plaintiff prior to this litigation. Id. at 6. The defendants assert that the plaintiff's claims

are based on statements made to the plaintiff by Kapsch to avoid a lawsuit by the plaintiff against Kapsch for the 2019 investment; the IIGNA defendants emphasize that they were not involved with the 2019 investment. Id. They argue that Mamalakis, who is the principal of the plaintiff, should face sanctions for suing six defendants based on statements by one, without any legal or factual basis for doing so. Id. at 8.

In a March 26, 2022 "safe harbor" letter to Mamalakis, the IIGNA defendants outlined the alleged Rule 11 violations. Dkt. No. 17-3. They asserted that the original complaint alleges that Kapsch told the plaintiff that Maloney had told him that the IIGNA defendants would fund the project—without even a meeting between the plaintiff and IIGNA, any due diligence on the project or the parties or any agreement as to the amount or timing of the funding in terms of IIGNA's investments. Counsel for the IIGNA defendants wrote that it was not plausible that Mamalakis—as a lawyer, president of the plaintiff and former executive of a high-speed trading business—would have any expectation of funding based on Kapsch's alleged statements. Dkt. No. 17-3 at 2-3. They explained that the complaint alleges only that Kapsch made representations to the plaintiff, but never alleges that Kapsch had authority to speak for IIGNA or anyone else. Id. at 3-4. And they asserted that the complaint fails to allege causation or damages because it concedes that the alleged losses occurred two years before any alleged involvement by the IIGNA defendants. The letter asserted that any damages resulting from the 2019

project, including alleged lost profits, are traceable to 2019 rather the alleged 2021 project. Id. at 4.

The defendants complied with the Rule 11(c)(2) safe harbor provisions by waiting more than twenty-one days after sending the letter to Mamalakis to file the motion for sanctions. The letter was dated March 26, 2022 and sent via Federal Express and email; the defendants filed the sanctions motion on April 27, 2022. Dkt. No. 17-1 at 11. On April 3, 2022, Mamalakis responded to the letter by asserting that the complaint was sufficient and declining to withdraw or amend the complaint. Id. at 7; Dkt. No. 17-6. Mamalakis responded that if defense counsel filed a motion for sanctions, Mamalakis "most certainly" would ask the court to have defense counsel sanctioned. Dkt. No. 17-6 at 2. Mamalakis asserted that he "now possess[ed] affidavits showing that our proposals made it from Kapsch to Maloney to all your clients." Id.[7] The IIGNA defendants point out that another district court has sanctioned Mamalakis more than once for spoliation, asserting defenses that "never had merit" and filing a "stream of frivolous motions." Dkt. No. 17-1 at 7 (citing Quantlab

_____

[7] Mamalakis's letter also stated that while the IIGNA web site reflected that IIGNA "exist[ed] just outside of Atlanta Georgia," there was "ZERO record of their existence in the state of Georgia," and asked "how many actual reputable and non-scam organizations make sure that they can't be found?" Dkt. No. 17-6 at 2. The defendants' original motion to dismiss reveals that IIGNA stands for Intrasales Investment Group (NA). Dkt. No. 16-1 at 6. The State of Delaware's Division of Corporations website reflects that Intrasales Investment Group, N.A., Inc. was incorporated in Delaware in August 2013 as a domestic corporation and is in good standing. https://icis.corp.delaware.gov/eCorp/EntitySearch/NameSearch.aspx. Dawley avers in his affidavit that the company's principal place of business is in Atlanta, Georgia. Dkt. No. 16-4 at ¶5.

Technologies Ltd. (BVI) v. Godlevsky, 317 F. Supp. 3d 943, 949-50 (S.D. Tex. 2018)).

The IIGNA defendants argue in the motion for sanctions that (1) the plaintiff's claims are not warranted by law, asserting that the plaintiff did not allege that the IIGNA defendants made any statements (particularly material statements) themselves, that Kapsch had the authority to speak on their behalf, that reliance was justifiable or that the plaintiff suffered damages separate and apart from the 2019 investment; (2) the factual contentions lack evidentiary support because Kapsch never was an employee, agent or representative of the IIGNA defendants; and (3) sanctions are necessary to deter Mamalakis's pattern of behavior. Id. at 13-21.

As noted earlier, the IIGNA defendants filed the declarations of Maloney and Dawley in support of the motion. Dkt. Nos. 17-4, 17-5. Maloney averred that he does not know Mamalakis; he never has communicated with Mamalakis orally or in writing. Dkt. No. 17-4 at ¶3. Maloney averred that he had no idea what the "investment opportunity was, received no money from" and never communicated with the plaintiff. Id. at ¶5. Maloney averred that he had not worked with Kapsch since at least 2020 and had no business relationship with him. Id. at ¶7. Dawley, as the CEO of IIGNA, filed a declaration averring that he has resided in New Jersey for over twenty years, has never lived or worked in Wisconsin and that IIGNA is incorporated in Delaware with a principal place of business in Atlanta, Georgia. Dkt. No. 17-5 at ¶¶2-5. He averred that neither Dawley nor IIGNA have conducted business

in Wisconsin or with any entities located in Wisconsin. Id. at ¶7. Dawley averred that neither he nor IIGNA solicit or advertise in Wisconsin and have no agents, employees or representatives in Wisconsin. Id. at ¶¶8, 9. Dawley averred that neither Maloney or Kapsch is an agent, employee or representative of IIGNA and neither Dawley or Kapsch is authorized to speak on IIGNA's behalf. Id. at ¶¶12, 13.

B.     Plaintiff's (Untimely) Brief in Opposition (Dkt. No. 36)

Almost three weeks after the plaintiff's deadline for filing a response to the motion for sanctions had expired, the plaintiff filed a brief in opposition to the motion. Dkt. No. 36. Mamalakis, as counsel for and president of the plaintiff, argues that the "fact that Defendants are filing a rule 11 motion is sanctionable." Id. at 4. He insists that the complaint "pleads very specifically all the fraudulent statements and when they were made," but begins his argument by citing to paragraph sixteen of the *amended* complaint, id., which was not the subject of the sanctions motion and was filed on May 6, 2022—some forty days outside of Rule 11's twenty-one-day safe harbor provision.

Mamalakis cites to paragraphs sixteen and eighteen through twenty-three of the amended complaint to support his argument that Kapsch and Maloney (through whom he says Kapsch acted) acted as agents of the IIGNA defendants and committed fraud. Dkt. No. 36 at 4-6. He asserts that the statements he attributes to the defendants are fraud—not puffery—because the defendants had no funding available. Id. at 7. Mamalakis insists that he adequately has pled reliance in paragraphs twenty-three and twenty-four of the

33

amended complaint. Id. at 8. He says that he has pled reputational damage in paragraph twenty-three and lost revenue in paragraph thirty-one. Id. at 8, 9.

Mamalakis rejects the assertion that he lacks evidentiary support for his allegations, arguing that discovery will "a) expos[e] all the communications which will prove our point," by "b) conducting depositions of not only Defendants but also the other individuals they either scammed or are in on the scam with them (Chicago Tower people) and c) learning the extent of careers in fraud (we will be asking for punitive damages so this will be relevant) . . . ." Id. at 10.

C.    IIGNA Defendants' Reply (Dkt. No. 38)

The IIGNA defendants ask the court to strike the opposition brief filed by Mamalakis because it was filed almost three weeks late. Dkt. No. 38 at 4, 6. The deadline for responding was May 18; the defendants point out that Mamalakis filed his brief on June 6, 2022, with no explanation for the delay. Id. at 6. The IIGNA defendants also point out that Mamalakis relies on the amended complaint filed outside of the April 18, 2022 safe harbor deadline to support his claims that he has pled with specificity. Id. at 5, 7. The IIGNA defendants contend that the amended complaint suffers from the same problems as the original complaint—all of which they described in their Rule 11 "safe harbor" letter served on Mamalakis on March 26, 2022. Id. at 7. They assert that Mamalakis offers no facts to support an assertion that Kapsch had any authority to speak for the IIGNA defendants. Id. Finally, they maintain that the unrebutted declarations of Maloney and Dawley make clear that the IIGNA

34

defendants had no relationship with Kapsch, didn't authorize him or Maloney to speak for them and did not know that Kapsch was speaking to the plaintiff about the IIGNA defendants. Id.

D.   Analysis

Rule 11 requires that an attorney certify "to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances" that a "pleading, written motion, or other paper" (1) "is not being presented for an improper purpose," (2) "the claims . . . are warranted by existing law" and (3) "the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery." Fed. R. Civ. P. 11(b). A court may impose sanctions "on any attorney, law firm or party" who violates the rule. Fed. R. Civ. P. 11(c)(1). A party need not wait to file the motion for sanctions—it can be brought when a plaintiff files a complaint without some minimum previous investigation. Shrock v. Altru Nurses Registry, 810 F.2d 658, 662 (7th Cir. 1987).

The motion for sanctions must be brought separately from any other motion and must identify the conduct that violates Rule 11(b). Fed. R. Civ. P. 11(c)(2). The motion must be served, but the moving party may not file the motion with the court "if the challenged paper, claim, defense, contention, or denial is withdrawn or appropriately corrected within 21 days after service or within another time the court sets." Id. "If warranted, the court may award to the prevailing party the reasonable expenses, including attorney's fees,

35

incurred for the motion." Id. The sanction "must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated." Fed. R. Civ. P. 11(c)(4).

"Although a court must credit the well-pled allegations of the complaint when deciding a motion under Rule 12(b)(6), [the court is] not so confined when considering a motion for sanctions." Tobey v. Chibucos, 890 F.3d 634, 652 (7th Cir. 2018). An attorney or *pro se* litigant "cannot avoid sanctions by claiming subjective good faith if a reasonable inquiry into the facts and law would have revealed the frivolity of the position." McGreal v. Vill. of Orland Park, 928 F.3d 556, 560 (7th Cir. 2019). Rule 11 utilizes "an objective standard of reasonableness" which leaves "no room for an 'empty head, pure heart' defense." N. Ill. Telecom, Inc. v. PNC Bank, N.A., 850 F.3d 880, 885 (7th Cir. 2017).

The IIGNA defendants seek sanctions against Mamalakis, who is not only the plaintiff's attorney but the plaintiff's president and its *sole member*. As a lawyer, Mamalakis is presumed to be familiar with the rules of civil procedure, including Rule 11. As the president and sole owner of the plaintiff, Mamalakis has reason to be aware of every communication the plaintiff conducted with Kapsch or anyone else. If someone other than Mamalakis interacted with Kapsch on behalf of the plaintiff (and there is no indication that there was anyone else), Mamalakis had a burden to make a reasonable inquiry of that person or those persons prior to making the allegations in the complaint.

Only twelve days after Mamalakis filed the complaint, the defendants

sent him a letter warning him that they were considering filing a Rule 11 motion and laying out the misstatements or uninvestigated claims in the complaint. Mamalakis received that letter, as evidenced by the letter he sent back to defense counsel. The tone of his response was belligerent, aggressive and defiant—much like his tone in the pleadings he's filed with the court. He did not take advantage of the opportunity to withdraw or amend the original complaint within the twenty-one-day safe harbor period.

A month after sending Mamalakis the safe harbor letter, the defendants filed the motion for sanctions. The defendants filed the motion on April 27, 2022; the safe harbor deadline had expired eleven days earlier, on April 16, 2022. Under this court's Civil Local Rule 7(b), Mamalakis had twenty-one days—that is, until May 18, 2022—by which to file a response to the motion. Mamalakis did nothing until May 6, 2022—almost three weeks after the safe harbor deadline had expired. Even then, he did not file a response to the sanctions motion on May 6; on that date, he filed an amended complaint (apparently in response to this court's routine order at Dkt. No. 18 reminding plaintiffs that when faced with a motion to dismiss, a plaintiff may file an amended complaint in lieu of a response). Mamalakis did not respond to the *sanctions motion* until June 6, 2022—just shy of three weeks past the deadline by which his response was due. When he did respond, he offered no explanation for the late response to the motion. Even during the January 31, 2023 hearing, he could not explain the delay beyond dismissing it as a mistake.

Perhaps Mamalakis was confused by the court's April 27, 2022 order reminding him that in lieu of responding to the motion to dismiss, he could file an amended complaint. Dkt. No. 18. Perhaps Mamalakis somehow was under the impression that if he simply filed an amended complaint, that amended complaint would resolve the allegations in the sanctions motion the defendants had filed earlier that same day. It is difficult to comprehend how he might have reached this conclusion—the safe harbor deadline had passed, the defendants had filed the sanctions motion earlier in the day and the court's April 27, 2022 order did not say that an amended complaint would resolve the sanctions motion. Even giving Mamalakis the benefit of that significant doubt, he has provided no explanation for the broad, aggressive, conclusory allegations he made in the original complaint. He has provided no explanation for why he declined to withdraw or amend the complaint during the safe harbor period after receiving the IIGNA defendants' letter. He has provided no explanation why he waited until after the safe harbor period had expired to file his amended complaint. He has not explained why he waited until weeks after the deadline to respond to the sanctions motion, and weeks after the defendants had filed a motion to dismiss the *amended* complaint on many of the same grounds, to respond to the sanctions motion.

The tone of Mamalakis's opposition brief is as belligerent, hyperbolic and bombastic as his letter responding to the defendants' safe harbor letter. He accuses the defendants, particularly IIGNA, of being "scam artists and criminals." Dkt. No. 36 at 4. He accuses the defendants of lying. Id. at 4, 7, 8.

38

He claims that the defendants' evidence supports his claims (which it does not).

Id. at 9. He concludes that sanctions are "warrented" [sic] against the

defendants, saying:

> The Motion to Dismiss and Rule 11 Motions are completely ungrounded in law. Plaintiffs are electing not to pursue them since that would only further Defendants strategy to paper the file and delay justice in this matter. We wont take the bait and it wont work. (Defendants cite to the Quanttlab trial, at totally separate set of Attorneys managed discovery in that case so it doesn't merit a response.)[8]

Id. at 11.

Neither in his written response to the sanctions motion nor in his

arguments at the January 31, 2023 hearing did Mamalakis produce any

evidence that either IIGNA or Dawley made any statement to Mamalakis or the

plaintiff. Even during the hearing, Mamalakis relied on Kapsch's alleged

representations but produced nothing to support his allegations that the IIGNA

defendants were working through Kapsch. He explained to the court that he

believed he had an objectively reasonable basis for the allegations based on

Kapsch's alleged texts indicating that Kapsch had cut and pasted messages

from the defendants (texts he has not presented to the court). This theory has

no support in Seventh Circuit case law and Mamalakis has not presented any

texts in which Kapsch says anything about having cut and pasted; Mamalakis

---

[8] The court has not considered the defendants' allegations regarding what a different court did regarding sanctions in a different case under different circumstances. The fact that one court concludes that a party's actions before that court are sanctionable is not evidence that the same party's actions before a different court are. The court has considered only Mamalakis's actions in the case before this court.

has not presented any texts at all, he has only referenced texts presented by the IIGNA defendants. Nor has he produced the affidavits he referenced in his response to the defendants' safe harbor letter, and in any event, he asserted that those affidavits showed only that his proposals had made it to someone at IIGNA, which the defendants verify. Passing a document along to someone else doesn't make the person who passes the document an agent of the person who receives it.

The court understands that the plaintiff's counsel is heavily invested in his position and is trying to represent his own interests as the sole member of the plaintiff. But Rule 11 requires that parties and attorneys make reasonable inquiries into the facts before filing a complaint and emphasizes continuing candor once it becomes clear that a position is untenable. See Fletcher v. Doig, No. 13 C 3270, 2022 WL 18027447, at *6 (N.D. Ill. Dec. 30, 2022) (citations omitted). The fact that Mamalakis is an attorney, not a civilian untrained in the law, means that he has reason to know what Rule 11 requires. The fact that he is the sole member of the plaintiff means that if there were communications between the IIGNA defendants and the plaintiff, Mamalakis would have made them. The plaintiff interacted with *Kapsch*. He read into and extrapolated from statements allegedly made by *Kapsch*. He allegedly made decisions based on things that *Kapsch* told him. But though he had no interaction with them and even became suspicious of Kapsch's representations, Mamalakis chose to sue people with whom *Kapsch* claimed to be interacting, instead of suing only the

person with whom Mamalakis interacted and from whom Mamalakis received representations: *Kapsch*.

The court does not impose sanctions lightly. But the record demonstrates that Mamalakis did not have an objectively reasonable basis for some of his allegations and assertions. For example, paragraph sixteen of the original complaint states:

> 16. In order to get Plaintiffs not to pursue recovery of the 900,000, to make a commission, and be able to get additional funds from the Plaintiffs, Defendants IIGNA, Dawley, Maloney and Kapsch through Kapsch made several factual representations including but not limited to 1) they had over 4 billion in cash free and clear to utilize, 2) that they were funding professionals, and 3) that they were ready and able to fund Plaintiff and he shouldn't pursue recovery of the 900,000, and that other monies may be needed to make it happen 4) and that they had a very tight relationship with a high up executive at Barclays who would never do business with anyone who wasn't legitimate.

Dkt. No. 1 at ¶16. Dawley has provided the court with sworn declarations that he did not know Mamalakis or know about the 2019 transaction. *Kapsch* may have made these representations, but Mamalakis has provided no evidence that IIGNA, Dawley and Maloney made representations to the plaintiff to get him to drop his mission to recover the $900,000 (or for any other reason). Paragraph nineteen of the original complaint alleges that "[a]s July, August, September and October of 2021 went by, every week a new notice was released *with direct statements from IIGNA through Dawley to Maloney* and then to Kapsch . . . ." Id. at ¶19 (emphasis added). The plaintiff has provided no proof that "direct statements" were made to Mamalakis or the plaintiff through this "Tinker to Evers to Chance" game of telephone. The original complaint even

41

indicates that the plaintiff began to be skeptical of what Kapsch was saying, and indicates that the plaintiff relied on Kapsch's response that Maloney would not lie because Maloney owed Kapsch money. Id. at ¶20. The complaint alleges that IIGNA and Dawley—through Maloney and Kapsch—had brought in Mizuho Bank. Id. at ¶22. But the plaintiff has presented no evidence that the IIGNA defendants knowingly made any statements to Mamalakis or to the plaintiff, or with the intention that their statements would get repeated or communicated to Mamalakis or the plaintiff.

As an attorney and the sole member of the plaintiff (with knowledge of the facts that he himself had observed and been involved in), Mamalakis signed the original complaint under Rule 11, representing to this court that the claims were warranted by existing law and that the factual contentions had (or were likely to have) evidentiary support. From all appearances, the allegations as to anyone other than Kapsch were assumptions and extrapolations, and questionable ones at that. In his response to the safe harbor letter, Mamalakis accused IINGA of being a scam company because he could not find evidence that the company had offices in Georgia—something he could have ascertained before filing suit by conducting a deeper investigation into IIGNA. It appears that Mamalakis did not question the fact that he never met or talked to anyone but Kapsch, despite Kapsch's alleged representations that millions of dollars would be involved. It appears that Mamalakis did not investigate during his dealings with Kapsch and did not investigate before filing a lawsuit against all the names Kapsch dropped during their interactions.

42

The IIGNA defendants complied with Rule 11—they gave Mamalakis an opportunity to address the Rule 11 violations before filing the motion. Dkt. No. 17-3 at 1. Mamalakis did not take that opportunity. The IIGNA defendants provided the plaintiff with the authority and supporting declarations showing that Mamalakis had no basis for asserting that Kapsch was acting as an agent on their behalf. Dkt. No. 17-3 at 1. Not only did plaintiff fail to address that authority and those declarations, but he filed an amended complaint adding even more allegations—such as that there were "hundreds" of communications between the plaintiff and Kapsch over the nine-month period covering June 2021 through February 2022, dkt. no. 25 at ¶21, and that the IIGNA defendants were taking actions to influence him (despite being in possession of affidavits indicating that some of them had never met him), dkt. no. 25 at ¶23. Mamalakis was profligate in the breadth of his allegations in the original complaint, profligate in failing to withdraw or amend that complaint during the safe harbor period, profligate in filing a late response to the motion for sanctions and profligate in his refusal to acknowledge that many of the allegations he made against the IINGA defendants were nothing more than speculation and conclusion.

The court will grant the defendants' motion for sanctions and will award reasonable attorney's fees and other expenses associated with the motion for sanctions and the motion to dismiss the amended complaint. Fed. R. Civ. P. 11(c)(2).

### III. Conclusion

The court **GRANTS** the IIGNA defendants' motion to dismiss for lack of personal jurisdiction under Rule 12(b)(2). Dkt. No. 30.

The court **ORDERS** that Christopher Dawley and IIGNA are **DISMISSED** as defendants.

The court **ORDERS** that by the end of the day on **April 14, 2023**, the plaintiff must file a second amended complaint naming Kapsch as the sole defendant. The amended complaint must take into consideration the court's discussion of the IIGNA defendants' Rule 12(b)(6) motion to dismiss during the hearing on January 31, 2023.

The court **ORDERS** that Kapsch must answer or otherwise respond to the amended complaint by the end of the day on **May 5, 2023**. If the defendant files an answer, the answer must comply with Civil Local Rule 10(b) (E.D. Wis.) by responding "in numbered paragraphs corresponding to the paragraphs" of the second amended complaint. If the defendant files a motion to dismiss the second amended complaint, he must cite the rule under which he brings the motion and must file a supporting memorandum (or a certificate stating no memorandum will be filed). Civil L.R. 7(a). Pleadings or motions signed by the parties must not be presented for an improper purpose and must be supported by existing law. Fed. R. Civ. P. 11(b). Factual contentions must have evidentiary support or be likely to have evidentiary support after a reasonable opportunity for further investigation or discovery. Fed. R. Civ. P. 11(b)(3). Denials of factual contentions must be warranted on the evidence or—if so

identified—reasonably based on belief or a lack of information. Fed. R. Civ. P. 11(b)(4).

The court **GRANTS** the IIGNA defendants' motion for sanctions. Dkt. No. 17.

The court **ORDERS** that by the end of the day on **April 7, 2023**, the IIGNA defendants must file an affidavit accounting for their reasonable fees and costs associated with the filing of their motion for sanctions and the motion to dismiss the amended complaint. The plaintiff may file a response by the end of the day on **April 21, 2023**.

Dated in Milwaukee, Wisconsin this 16th day of March, 2023.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**